Mark Gross, Pomerantz, LLC, New York City Plaintiffs here are investors in Atossa Genetics, a company that was listed on the NASDAQ, and we bring this as a securities fraud class action. The plaintiffs assert that during the period November 2012 through October 2013, Atossa fraudulently misled investors in the market to believe that its two key products had been cleared by the FDA for breast cancer screening purposes. These two products represented 99% of the company's revenues and thus was critical to its success. Investors did not learn until October of 2013 the real truth. At that time, the FDA compelled Atossa to issue corrective statements. Its first statements were as follows. The first product, Mascat Pump, had not been cleared or approved by the FDA for cancer screening purposes. And its second product, the Foresight Test, had not been approved or cleared by the FDA for any purpose whatsoever. The FDA not only forced corrective statements, it forced the company to recall all the products, lest women be put at risk for false positives, and that the company be forced to stop selling. As a result of these revelations, the stock fell 46%, reflective of the damages sustained by our clients in the class. The company has never recovered, and stock is selling for less than a dollar per share. Now, the lower court dismissed these claims, despite agreeing that there were two statements issued by the company that were, quote, inaccurate. We submit that there were far more than these two statements, but for purposes of this appeal, we'll just focus on those two, because we think that they are far more determinative. The two statements were issued by the CEO of the company. The first was in December of 2012, wherein he said the Foresight Test was, quote, cleared by the FDA for breast cancer risk assessment. That's in the press release, right? That is correct. And that's not a misstatement by him, or he's not misspeaking at the time. This is a written statement that's attributed to him. And the second statement is also in a press release in February, or an interview, in February 2013. Again, the Foresight Test has, quote, gone through the FDA clearance process. And that process, he said, was a multi-million, multi-year process. And that the test is a pap smear for breast cancer. Those aren't inaccurate statements, Your Honors. They were bald-faced lies. If the FDA cleared the mask pump for collection purposes, you collect, you know, something from a woman's breast, the fluids using this pump, it's cleared by the FDA for that collection purpose? Yes, Your Honor. We don't just, I'm sorry. Is it a half-truth that we're talking about here? Well, no, it's, well, is it a half-truth? It's certainly misleading, Your Honor. The pump used for this collection of aspirate could be used for cancer purposes. I must say I don't fully appreciate the distinction between cell differentiation and cancer detection. But nonetheless, this FDA made a determination that this was an overstatement. When the request for approval by the FDA of the pump was made, did it indicate that it ultimately had this purpose intended for cancer? I don't know, Your Honor. The approval of the mass cat pump was back in 2002 or 2003. The company, it was used for other purposes, and it wasn't until 2000, the beginning of the class period thereabouts, that it was linked to this diagnostic test, the foresight test. Would it make a difference if it did indicate that? Clearly, on both instances, the CEO is talking about the foresight test, and without that, this is a meaningless product. If they were, to this day, I mean, they could still be marketing that pump, but they're not generating any revenues. So your whole thrust of your case turns on the test, not on the pump? Correct. I would certainly emphasize the foresight test aspect of it. In any event, what your point is, is that the test, the way they represented the misrepresentations about the test clearing the FDA, that would have been material to any reasonable... It certainly was, absolutely, Your Honor, and no question that it was material, that investors relied upon it, that analysts relied upon it. And the court did not necessarily say the statements were by themselves not material. They said in the mix of information, they were rendered immaterial. Well, that's because he linked them to the pump as well, and the statements about the pump weren't necessarily false. Your Honor, that might be one way of reading his opinion. That's the way I read it. Well, I frankly was not certain what he was linking was other information in the market that would have dispelled... As well as discussed above. I mean, if you read the first part of his order, it's a lot about the pump. That is correct. I mean, certainly in the registration statement, there are some clearer statements about the, or clearer statements about the mascot pump. But there's nothing in the registration statement that would lead a reasonable investor to realize, oh, the foresight test has never been approved, and to the extent that they're trying to market this combination of products to 55 million women who may be exposed to breast cancer, that they should realize, oh, it's not approved at all for that purpose. That's certainly not self-evident. And that's the outcome. If I may, Your Honor, there's more than objective evidence in the record right now on the pleadings, because, Your Honor, this is a motion on the pleadings, and there's certainly a disfavor of dismissal on material grounds, even at summary judgment per time, which is all the cases since Apple in this circuit. But in any event, not only on the pleadings, but without oral argument before the Court, but there are at least four objective factors that the Court did not give any weight to, or sufficient weight to, in its decision. First and foremost, the analyst reports. It's well known in the securities field that the analysts are the key to interpretation of data from the companies, and they sift through that information, they make recommendations, that's reflected in the stock market. That's what was said in Basic v. Leviton, that's what Chief Justice Roberts said recently in the Halliburton II case. And here we have direct evidence. The Dawson Securities recommended the buy of this stock in May of 2013, well after any of these other statements, based on his apprehension that there were two approved products with innovative marketing by this company. Clearly, he didn't get it, and there's no reason why one should assume that the investor should have gotten it if he didn't get it. The next, the FDA compels the company to make or restate or to make corrective statements to the market. The FDA is concerned at that point that doctors are not getting it. Now, if physicians who are sophisticated in this area could be misled, there's no reason to believe that investors were not being misled as well. The source of the information or misinformation in this case should also be considered, because there it was, in this case, it's the CEO. It's not just a random statement issued in a press release or buried in a SEC. It's right up front. And here, why should investors presume that a CEO doesn't know what he's talking about? I mean, he made an unqualified statement. And last, before I stop for the moment, the stock price. The stock price is reflective of the information that's out there in the market. It fell 46%. That's clearly prima facie evidence that the market did not know that there was no FDA clearance or approval for breast screening purposes. So unless Your Honors have... Could you just clarify, I just want to have you clarify one thing about the record, the procedural record. So at the end of the judge's order, he said, I'm supposed to give leave to amend. Yes. And if you want to amend, go ahead and amend. And I gather you felt no need to amend. Your Honor, we felt that this was a judge who did not understand our situation or what we were claiming. He did not bother to ask us in for an oral argument before rendering this decision. We could have perhaps added many more statements to this, to bolster us. But we felt that this was sufficient. Right. I just want to clarify that you feel that the complaint as, the operative complaint is sufficient as pled. Correct. And what we would request is a remand to allow the case to deny the motion to dismiss and allow the case to proceed on merits discovery. And let's face this materiality question at the appropriate time after merits discovery, expert reports and the like. Thank you, Your Honors. Good morning, Your Honors. Judge Gould, Judge Paez, Judge LaMalle, may it please the Court. Judge Martinez below got this right. Defendants did not make statements that were misleading to the market. The mass device, as Judge Paez mentioned, was indeed FDA cleared for a particular purpose. Well, what was that purpose? And what I'll point out to you here at the very beginning, Your Honors, is that as admitted below in the briefing and in the complaint below and here on appeal, this mass device had a purpose. Not just to collect nipple aspirate fluid specimens from the female breast. And I want to read that to you now. I think many of their allegations founder on this description, this approval by the FDA. The FDA cleared the device through a 510K premarket clearance dating back to 2003. When you say the device, you mean the mass device. Mass device, correct, Your Honor. But it didn't clear the foresight. No, it did not. And we'll discuss that next as well, Your Honor. It said that for a sample collection device with the, this is quoting now, the provision that the fluid collected using this device can be used to determine and or differentiate between normal, pre-cancerous and cancerous cells, close quote. That's excerpts of record 48 and 49, the opening brief by plaintiff's appellants at four. Their case crashes against this fact. Okay, but let's say the mass device was. And my understanding was there was also some relatively minor problem they were using a different model? Yes, Your Honor, I'll address that now since you've asked the question. So in 2003, the device was cleared by the FDA, received a 510K premarket notification authorization. At some point thereafter, the company made very minor changes to this device. What they did is initially the original form of the device was to express the nipple aspirate fluid from the breast, collect it in a membrane in the hand pump, and then wash those cells collected into a vial and then ship the vial to the lab for testing. What the company concluded, I think smartly so, was that there was a lot of user error involved in washing with a fluid cell. So they took the cells down into a vial that could affect sample size and other things. They determined the better method would be to just take that membrane that had collected those cells, take it off of the device itself, spray some fixative solution to it, drop it in a baggie, and ship that to the lab. What that gave them was a larger specimen size to allow them to run the foresight test. So it may not be a problem that they're using a different model that they think is improved? It's rather technical. But the purpose you read when the mask was approved, that the fluid could be used to screen for cancer cells, says nothing about whether your client, whether their test to screen for cancer is effective and approved. In other words, at least I thought that the mask device gets the fluid and then the foresight test tests it. If there was no approval by the FDA of the test, then how could the CEO of the company say that FDA clearance risk is achieved and that the product is approved by the FDA? Yes, and that gets me to the next point, Your Honor, which is the foresight test. As my opponent mentioned in his opening, he believes that this case revolves around the statements made by Dr. Quay and the company in a press release and in an interview regarding the foresight test, which is the other, we'll call it the other half of this case, which is the test done in a laboratory. Now, what is the foresight test? The foresight test is a test run on the nipple aspirate fluid collected through the mask device. It is shipped to the lab. The lab is a separate subsidiary company of Atosogenetics, which is a national reference laboratory for breast health. That subsidiary then runs a cytopathology test on that nipple aspirate fluid. What that test is designed to determine is, is there a presence of atypical ductal hyperplasia? In other words, abnormal growth of cells in the breast. This is not unique to Atosa's test. But it successfully depends on FDA clearance. Well, let's get to that then. Well, for investors, they want FDA cleared, they want it to be on market, they want it out there, they want to, you know, make money. That's what it's all about. And you can't do that without FDA clearance. I respectfully disagree, Your Honor. Why not? So Atosa mentioned hundreds of times correctly that the mask device was FDA cleared. It only on two occasions, as pointed out by plaintiffs in their complaint, on only two occasions did the company incorrectly misspeak and reference the Foresight test as one that had also been FDA cleared in some fashion. And it's our argument in our briefs, and I'll do it here today as well, is that those two statements, when viewed in context, were not misleading to the market. Why are they not misleading in context? Because, you know, you can have a great device to get fluids, but a bad device doesn't work. You can have a great device to test, but if the testing device hasn't been approved, then how do the investors make a decision whether this package can sell? Yeah, so let me get to the statements made. My opponent focused on a December 20, 2012 press release. In there, the statement was, quote, our first FDA cleared and marketed product, the Foresight Breast Health Test for Breast Cancer Risk Assessment. That was the statement. Now, in that very same press release, the company also said, to eliminate any confusion that investors may have by that statement focused on by my opponent, they distinguished between the device and the test. They identified the device as being FDA cleared and patented, and the test as only being patented. They identified the Foresight test as being a laboratory developed test, or an LDT. Now, what we know from the yes. Could you clarify one thing for me, though, just before you finish this? Yes. What had the FDA notified them was wrong with their representations? Which representation are you referring to? Well, so around, the FDA issued a letter to Atosa, correct? Yes. About the test, to tell them that it was not, they were mis-advertising or mis-labeling. Is that right? Am I mistaking something here? There was a warning letter issued that was received in mid-February of 2013. And didn't they highlight the misstatement? No, they highlighted in that warning letter their concerns about the mass device requiring a new 510K authorization, because they had modified the device. I thought they also complained about the labeling. No, the other complaint was that there was, in their belief, a failure to comply with certain bookkeeping and filekeeping requirements under the current good manufacturing practices. I may have misread the record, but I thought that they had alerted them that it was incorrect to say that the test was FDA cleared, clinically proven, and peer reviewed. The foresight test provides women, blah, blah, blah. Your foresight test has not been cleared by the FDA. Yes, there is one phrase in that letter, I believe on the third page of that warning letter, where it does reference the foresight test. The only statement in that warning letter regarding the foresight test is... But it's very clear. Your foresight test is not being cleared by the FDA. And then he doesn't relate that. But here's the point, though. The point is that that foresight test did not need to be FDA cleared. It was a laboratory-developed test. LDTs for 40 years, through and beyond this class period, were not regulated by the FDA. They exercised discretion to not regulate homebrew or LDTs, these tests. Atosa, unlike many companies who had LDTs, in its IPO prospectus and its 10Ks, told the market, look, right now we're not regulated by the FDA with respect to our test. But that may change. The FDA is making noise that we may wind up having these tests regulated and requiring FDA approval. But as of now, they are not being required. I was just going to say, isn't saying this is not required to be regulated by the FDA different than saying this has been approved, that it's been cleared by the FDA? I thought the statement by your CEO said clearance risk has been achieved, or more or less was phrased in a way that would give the impression that there was FDA clearance on the test. Yeah, and that gets me to the point I was going to make before I had to answer a few questions. And that is why his misstatement or his misspeaking in that Insights interview in February and the statement identified by plaintiffs in the press release in December were not misleading. And that is, number one, because they identified the Foresight test as an LDT. Therefore, not being within the ambit or the jurisdiction of the FDA at the time. They identified it as being only patented, not FDA cleared. And they identified the lab as being CLIA certified, which again is an indication that it was regulated by a different set of rules, which was the CLIA certification rules. Now, also taking a broader context. Yes. Regardless, counsel, whether or not the scope of the FDA letter, warning, what have you, it wasn't made public until what, after the interview by Clay, correct? The interview was published on February the 22nd, and the FDA warning letter was published. I'm thinking about the letter wasn't made public until March, wasn't it? No, the letter was, the press release was, so Atosa released a press release describing, in fact, even quoting from the warning letter on February the 25th. They then, in connection with their response to the FDA, demanded the FDA post their response on the FDA's website. And we know at least as of that date, March the 20th, the FDA's initial warning letter was on that website. It may have been earlier, we just don't know. But in his interview March 15th, did he acknowledge that in detail? Yes, in fact, in the March 15th interview, he referenced the warning letter. And again, remember, in March they had already issued a press release where they described in detail the FDA's concerns with the Atosa products. Isn't your opponent's position that what he disclosed in March 15th was still materially misleading? And if this is taken in the context of a motion to dismiss, should we construe that as true for now? Well, this gets me back to why it was not materially misleading or misleading at all. And looking at the total mix of information. Because, let me get back to, again, with that first, I'll call it an exception, to their otherwise consistent description of the Foresight test as only being CLIA certified and patented, not FDA approved, the one exception was in December. And I've identified the reasons why in that actual press release confusion was cleared up. And then just around that press release, the very next day, the company issued a 10-Q, okay? The very next day after that press release. And in that Q, the company identified the mass device is FDA cleared and the Foresight test is only being patented. Yes. Confusion seems to be a key thing in this particular matter for your side, to some extent. I'm just wondering whether or not it was premature, given the confusion, to summarily dismiss in the light of all the confusion. I guess that's my concern. Right. And what I would say is there was no confusion to the extent plaintiffs are arguing there should have been confusion or there was confusion. That confusion was cleared up in the actual release itself. I'm only using your word, confusion, even after the release. Even if there was confusion, I said, Your Honor, yes. So I want to get to the second exception to the otherwise consistent statements made by my client regarding the Foresight test. And that was in this February 22 interview that was published on February 22. In that interview, that publication, he did say that it has gone through all of the FDA clearance process. Now, he may have misheard the question, but the context is clear. He's referring to the mass device, not the test. How do we know this? Many reasons. Number one, he said we are, quote, manufacturing it here in the States. You don't manufacture a test. You conduct a test. He was referring to the device. Also, if you look at that phrase in the actual article, both above it and below it are pictures of what? The mass device, hand pump, the device. Next, later in that same article, it states very clearly that Dr. Quay, the company's CEO, that he oversaw the clinical testing of the mass device with the FDA that led to its ultimate marketing clearance, close quote, with the FDA. That's also there. So you're saying that this is your expert testimony that it didn't matter, as opposed to your argument that it doesn't matter? No, Your Honor. In fact, it doesn't even require anything beyond the pleadings, and I'll tell you why, which is we have a Supreme Court decision in the Omnicare case and this Court's decision two weeks ago in the Aligned Technologies case. What we know now is that the Omnicare standard of evaluating opinion statements, okay, applies to Section 10B cases, not just Section 11 cases, so to the statements made here in this case. And Omnicare has the general language which says that while a statement may be viewed, quote, in a vacuum as being false or misleading, once the statement is considered as is appropriate in a broader frame, it may not be. That broader frame, as we know from this Court's decision in the Stack Electronics case and in Omnicare itself, is the entirety of the actual press release or of the interview or of the SEC filing. And the broader frame also includes, under Omnicare and Aligned, other things, which includes context of hedges, disclaimers and other apparently conflicting information. All that, in the totality of the total mix of information, shows that there was no misleading statements made. Thanks, Counselor. And you're over your time, but we took you over it by our questioning. Do you feel you've covered your points? I never do, Your Honor, but I think we're fine. Thank you. Thanks. Thank you, Your Honor. The number of points I would like to respond to, we did reserve the time before. Counsel has just referred to the Omnicare decision. It's very contextual when you're dealing with an opinion, but this is not an opinion case. This is a fact case. There was no suggestion that, well, we believe that we are in compliance, that we believe good will is appropriate. Here is a simple fact that was stated. FDA had approved the Foresight test. So Omnicare and the recent case cited, they have no relevancy to the analysis here. We also acknowledge that the Foresight test is a lab certified test, and therefore it was not necessary to get FDA clearance. However, that's not what the market understood to be the case. If the CEO in this case had said, there is, we didn't get clearance for this. We just got certification for it. We wouldn't necessarily be here. But he said something quite different. He said, I've got approval of this. I've spent a million dollars getting approval on this. Now, that's clearly misleading. And why the investors and analysts should be going through the fine print to realize, oh, you mean you misspoke then? And he didn't, the company did not misspeak just on two occasions. The FDA came in, they weren't looking at these interviews to investors. They were looking at what was being sold to the doctors. The doctors were being misled, and that was what was in the warning letter. That was what led to not only having to make corrective statements, but to withdraw the product entirely. If you're given the opportunity to discover and determine whether or not there were investors who had some reasonable basis to believe that they were misled to and caused them to invest because of the statement about the FDA clearance of the test itself, are you prepared to do that? Absolutely, Your Honor, because it's already in the record. We have the analyst's statement. The analyst was recommending purchasing the stock. The analyst did this in May of 2013. This is eight months after the registration statement. Three months after the February statement regarding the fact that a warning letter after the warning letter had been posted, but obviously nobody realized that the problems were not just regarding the changes to the technical parts of the pump. They were far more grave than that. So we believe very confidently. Did the district judge here just make a credibility decision? A credibility decision. Concerning the weight of that evidence. I don't believe he, there's nothing in his opinion that suggests he even considered the analyst report. So it's not clear to me whether it hit his radar or whether he dismissed it entirely. It's not clear to me whether he gave any additional weight to the fact that these were CEO statements. And if I may, Your Honor, speak to the fact that, as my brother has said, that, well, if you read everything carefully in the December 20th press release, you would have realized, oh, this is not what the analyst reported. It was really being said by the CEO. And we'd urge you to look at the record at SER 7879, if I may, Your Honor. It's in the first paragraph of that press release where there's a statement about boasting of the FDA clearance for the cancer screening. It's not until you get to the very end, the second page, buried at the bottom, where there's a generic statement about what the company sells. And it says, if I may read the entirety, it's short. We have a patented FDA cleared medical devices and patented lab tests. Now, you've got to read that very slowly and carefully to realize, oh, FDA cleared does not apply to the second half of this sentence. And, you know, despite the fact that it's all jumbled together, it's like a jigsaw puzzle and you don't realize, oh, it meant something else. And, frankly, we didn't get it when we drafted the complaint in the first instance. But putting that aside, this Court has spoken in Miller v. Thain that falsity is measured not by the literal truth, but by the capacity to accurately inform rather than mislead. There's no question that the market was misled, the analysts were misled, our clients were misled, and all were suffering as damages as a result. We therefore ask your honors to reverse the decision and allow this case to go forward. Thank you. Thank you, counsel. Well, it's a very challenging case, and we appreciate the excellent advocacy on both sides of the case. The case of Levy v. Natasa Genetics shall be submitted. And with that, we adjourn for the day. Thank you, counsel.
judges: Gould, Paez, Lemelle